We'll hear argument first this morning in Case 11-820, Roselle Vachaidez v. United States. Mr. Fisher. Mr. Chief Justice, and may it please the Court, In the more than 20 years since this Court decided Teague against Lane, it has had more than a dozen cases in which people have sought habeas relief based on ineffective assistance of counsel. This Court has never once held that applying Strickland in those divergent factual settings constituted a new rule. For two reasons, this Court should reject the government's argument to do so for the first time here. First, Padilla was dictated by precedent. That is, like other Strickland cases that came before it, this Court in Padilla simply applied Strickland's formula of assessing attorney performance according to prevailing professional norms to a new set of facts. Second. Roberts. It's a surprise to the, what, ten courts of appeals who came out the other way? No, I don't think so, Your Honor. Two things about the lower courts. The first is there are only three lower court decisions that postdate the 1996 Act that the government can cite that came out the other way in terms of the question presented here. And the second thing is, even within those cases, even within those courts, they didn't distinguish between deportation advice and other kinds of advice. They distinguished between acts and omissions. That is to say, it was a uniform rule in the lower courts at the time this Court decided Padilla that misadvice concerning the right to deep – I'm sorry, concerning deportation consequences of a plea did violate Strickland. So the distinction in lower courts was not between deportation advice and other kinds of advice. The distinction was between acts and omissions. And Padilla itself – So maybe it was a surprise to the members of this Court that disagreed with that? No. With the ruling in Padilla. Well, obviously there was a dissent in Padilla. But this Court has held before that new applications of Strickland did not constitute a new rule, even though there were dissents. In Williams' case – What about the argument that Strickland doesn't come into play unless the Sixth Amendment includes the collateral consequences in counsel's obligation to defend a defendant in a criminal case? The argument is that up to – up to Padilla, only advice relevant to guilt or innocence and sentencing was required, not collateral consequences. Well, that was obviously the argument that the State of Kentucky made in that case, and this Court dealt with it in Part 2 of Padilla. Now, remember, Justice Ginsburg, the Court did not extend Strickland to collateral consequences in Padilla. It actually reserved that question. What it held is that deportation consequences are not removed from the ambit of the Sixth Amendment. So, remember – Ginsburg's question, if conviction meant loss of a professional license, that would be an open question. I think that's an open question after Padilla. What this Court held in Padilla, and this is the second-to-last sentence in Part 2, is that advice concerning deportation consequences of guilty plea are not categorically removed from the Sixth Amendment. So what I understood the Court to do in Padilla was take the ordinary Strickland formula of prevailing professional norms and simply apply it to this criminal case. Remember, Padilla itself is a criminal case. Scalia, it's always the case. I mean, we never come out with a decision that doesn't rely upon some preexisting principle. We always cite some preexisting principle. Does that mean that every case of ours is not new law? Of course not. The question this Court asked under Teague is whether it broke new ground. And I think what this Court said in Padilla is we reject the artificial restriction on Strickland that the lower courts have created. So, therefore, this Court simply reaffirmed Strickland. It didn't – Kagan. Well, Mr. Fisher, think about this in an AEDPA context. I mean, assume that you have these ten circuit courts all going in the way that the Chief Justice said, and then one court came along and said, you know, we think that they – in an AEDPA context, a habeas consideration of a State conviction. We think that this is all wrong, and in fact, the law is exactly the opposite of what ten circuits have held. Wouldn't we think that that's a very easy case, that the AEDPA standard had not been met? Fisher, I think you may well find that, Justice Kagan, but the reason why is because you'd find that there was not an unreasonable application of preexisting law. What you would not say is that the clearly established law is any different. So, remember, this Court, this case, because it's a Federal case, raises only the first question under AEDPA in a sense, which is what's the clearly established law? And this is the Chief – I think this is responsive to the Chief Justice's question about the dissent. There was a disagreement on this Court about how to apply Strickland, but the question is whether a new legal rule was created, not whether there was an unreasonable application. Scalia. Why pick on Strickland? I mean, you could say that about any principle of law that we rely on. The dissent thought that that principle applied a different way here. What is different about Strickland that it enables you to appeal to that as opposed to appealing to any principle of law? Fisher, I think the best response is what this Court said in Williams, which is Strickland provides sufficient guidance to resolve virtually every ineffective assistance claim. So what this Court said in Williams is we do not make new law when we apply Strickland. And I think Justice Kennedy Is there any – is there, Mr. Fisher, is there any application, you call it application of Strickland, that would qualify as a new rule, any application at all, or is just Strickland never a new rule? I think so long as you simply applied Strickland, you wouldn't create a new rule. If you, for example, said a certain kind of claim does not need to have a prejudice showing, that would be a new rule. Suppose that a really skilled attorney, after negotiating a plea bargain, or even representing a client at trial but then losing, is very skilled at ensuring that the defendant can go into the general population, not into a solitary confinement. But if also a skilled trial attorney, he's just not very good at that, and so the question is, could – if there was an evolution of the law of adequate assistance of counsel so that this Court later held, oh, conditions of confinement have to be part of the attorney's skill and competence in representation, that would be retroactive? Mr. Kennedy, it wouldn't be enough to have a later evolution of prevailing norms, because Strickland is a backward-looking device. So that there are then, in answer to Justice Ginsburg's question, some cases in which there could be a new rule of ineffective assistance of counsel under Strickland? Well, I think the answer to that question is yes. And as I said, something like a scenario where the Court – I don't understand how that works with my hypothetical. Well, let me try to work with your hypothetical. I think what I understood your hypothetical to say is that prevailing norms change, and they evolve to a certain point where certain kinds of advice is required, which is much what this Court said in Padilla about deportation advice. You would have – you would not have a new rule to simply recognize that at the time that attorney gave advice that Strickland was violated. It would be a new rule, I think, Justice Kennedy, to say that Strickland requires relief, even though at the time the advice was given, the prevailing norm had not yet crystallized into the degree that this Court requires relief. The only new law is not a new pronouncement, which nobody had ever thought of before, but only a pronouncement that rests upon an evolution of Maury's? Is that it? No. I think what I'm trying to say is Strickland sets up a two-part test, and we're only talking about the first part, which is attorney performance. And that question is key to attorney performance at the time judged by reasonableness according to prevailing professional norms. Now, those prevailing professional norms are, in a sense, a factual question. They're an empirical question that have been asked. Kagan, Mr. Fisher, it seems to me that this case presents a kind of threshold question. Before you get to the question of what are prevailing professional norms and whether they've been complied with, there's the question of whether the Sixth Amendment applies to collateral consequences at all, and if so, of which collateral consequences. And that's the question on which Padilla opines, and that's the question that seems, you know, very different from anything that Strickland's discussed, not just an application of Strickland. Fisher, Well, let me give you two answers to that, because I think that's the government's main argument here. First is, as I've tried to say before, simply saying that an exception that the lower courts created doesn't exist, doesn't create a new rule. Imagine this Court said, laid down a rule that covered all cars, and the lower courts devised an exception to that rule for convertibles. And when the Court — when the issue came to this Court, this Court said, well, no, when we said all cars, we meant all cars. To me, that doesn't create a new rule. And I think that's what this Court said in Part 2 of Padilla, is that this artificial  restriction. Breyer. How many had? Pardon me? How many had? I mean, I would have thought it was common sense that a lawyer should tell the client the terrible things that are going to happen to him if he pleads guilty, those things that the lawyer knows or should know about, and the client may not. All right. That's a very general rule at that level. But some courts had said, no, that isn't true. That isn't true unless, if it's — as Justice Kagan said, if it's a collateral exception, if it's a collateral consequence, how many had? Was it only Kentucky, or was it fairly widespread, this exception? Only three Federal circuits had had a ruling like that after the 1996 Act. Well, there aren't that many. There are 11, and two of them are specialized. If I can finish my answer, only three had rulings like that after the 1996 Act. And all three of those relied on pre-'96 Act rulings. And as court of appeals judges said, that's just not quite enough for us to be able to be entitled to overturn our prior circuit precedent. So while the government comes here today and suggests that 10 circuits and all these State courts had ruled in a sense in its favor, you know, it's almost more accurate to say none had had this issue cleanly presented to them after the 1996 Act. And, Justice Kagan, if I could go back to the 1996 Act deportation, there were deportation consequences. Those consequences were enhanced by the 1996 Act. But even before that, a reasonable lawyer, you might think, would have a conversation with his client about the deportation consequences of a conviction. That may well be true, Justice Kagan, but I'm saying in the 1996 Act, as this Court said in Padilla, whatever doubt there may have been about prevailing professional norms crystallized at that time because of the severity. And I think that's the second answer I wanted to give to your question about this so-called threshold question in Padilla, is that even if there's some question as to whether the Sixth Amendment applies beyond, as the government puts it, criminal jeopardy, this Court had already answered that question in St. Cyr, where this Court said in the text around footnotes 48 and 50 that any competent lawyer would give his client advice and a warning about deportation consequences of a plea. So even if you needed more than Strickland itself, St. Cyr gave that to you in 2001, which is enough to decide this case, it was enough to decide Padilla. Alito, I think it would depend on what the prevailing professional norms look like. I take it what this Court said in Strickland and what it reaffirmed in Padilla is we're not going to micromanage effective assistance of counsel. We're going to leave it to prevailing professional norms. I seriously doubt that prevailing professional norms would require the holding that you described. But to the extent they did, I don't think it would be a new rule. To the extent they didn't and this Court said we're going to push the Sixth Amendment beyond that, you would have a new rule. Scalia, I suppose you're right. I'm sure you're right that the mere fact that there was a dissent in the case that adopted the rule does not necessarily make it a new rule. But you, on the other hand, would agree, would you not, that those who dissented from that case would regard it as a new rule? That's a tricky question to answer, Justice Scalia. I think it's an easy question. Well, I think I could answer it one of two ways. One is I could say, yes, they did, to the extent they did regard it as a new rule, I think the dissent was, with all due respect, slightly mistaken about what the holding in Padilla was, which was not to the extent. Scalia, that's fair. The dissenters ought to reconsider, you're saying. Well, I think that the way the dissent put it was, is that advice is now required beyond criminal cases and criminal jeopardy. The way that I think Padilla majority described its holding was that this is a criminal defendant in a criminal case entitled to advice from this criminal lawyer, and the most important piece of advice as to whether to take a plea or not involves deportation consequences. And, Justice Scalia, I think that's fair. Kennedy, it seems to me that the predicate question that we decided in Padilla was that Strickland applies to matters not within the control of the trial judge. That, it seems to me, was a holding the Court had not addressed before and that other courts had not addressed before. Well, it had to be more than that, Justice Kennedy, because, of course, there's lots of ineffective assistance cases. No, I'm saying it's a predicate question. Well, no, no, but I'm saying there are lots of ineffective assistance cases before Padilla that involve matters beyond the judge that turned on what the jury did, of course. And I could — I may be able to think of others beyond those two scenarios. But there's no language to that effect in Padilla. What the Court said is that we have never created artificial distinctions about what an attorney has to do. As this Court put it in Strickland, Strickland itself, the client is advised to his lawyer's advice about all important decisions. And as this Court said in St. Cyr and other cases, the most important consideration as to whether to plead guilty is whether somebody will be deported. And so you put that together and you had all the law you needed, certainly by 2001. Roberts I think you've been asked this, and I'm not sure I got your answer. Give me an example of something that, like the consequences in Padilla, that would not be covered by your argument. Fisher Well, some sort of consequences that prevailing norms didn't require a lawyer to advise his client on. So, for example, I would expect that a lawyer is not necessarily required to give detailed advice about future employment opportunities. To a client, depending on whether he pleads guilty. Ginsburg You answered that question when I asked it. You said that removal of a professional license would not fall under, would be at least an open question. Fisher I think it would be an open question as to how Strickland would apply. I simply don't know what the prevailing professional norms are. I don't know what the prevailing professional norms are in that situation. Roberts If you had that case, what would you rely on in arguing in favor of the habeas proposal? Fisher Well, I would start with Strickland and you would talk with Padilla, right? Yes, that's what I would do, and I would look to prevailing professional norms. And I think if I could give a generic answer, the question would be whether or not that kind of advice is so important to the client's decisionmaking, and that's the  I would like to take this opinion in support of your position and to begin by saying prevailing professional norms do not change.  No, no, Justice Kennedy. Kennedy It seems to me that you're, that the defense bar generally would want to say that prevailing professional norms change, but that, that hurts you in this case. Fisher No, I don't think it does, Justice Kennedy. I agree with your premise, I think, that prevailing professional norms can and do evolve. And so the question this Court asked in Strickland is, as of the time the advice was given, did the prevailing norms require that? The advice was given in this case almost at the identical time of the advice in Padilla, and indeed far after St. Cyr. Kennedy I'm not sure it was cited in the brief, but the ABA comment in 1999 said now the ABA standard applies to professional standards, and that goes beyond the constitutional minimum. So that doesn't seem to me to help you either. Fisher Well, I'm not sure that's what the ABA said. I believe the ABA quite rightly said we don't make constitutional law in this body. We leave that to the courts. But Kennedy It said, it should be stated that these standards do more than enforce the constitutional minimum. Fisher Well, I think there may be elements of the standards that did. But remember, we're not just talking about the ABA here. As this Court noted in Padilla and as one of the amicus fris from NACDL notes in this case, there's a wide Kennedy I'm talking about the ABA here, if you want to give some other authority. But when I say that, it seems to me does not help you. Fisher Well, then I'll rely on just the overall body of professional norms, which is what this Court looked to Padilla and what it's always said it has to look to under Strickland cases. If I could return, if I could transition to talking about the nature of the backward looking effect of Strickland, I think there's an important second question in this case that if this Court were inclined to hold that there was a new rule, you'd be forced to confront. And it's a very serious question involving this Court's administration of criminal appellate procedure. And that is whether Teague ought to apply at all in this context. We believe that under the system this Court established in Massaro for handling IAC claims, it simply doesn't make any sense to apply Teague here and indeed would throw a gigantic monkey wrench into the way things have been done for the last decade after that decision, and for two reasons. One in theory Kagan Before you get to the reasons, the government says that you forfeited this argument. Could you address that? Sure. We didn't forfeit this argument. It's fairly included within our question presented. We raised it at the first available opportunity in the Seventh Circuit because we were foreclosed by circuit precedent from raising it. So we raised it before an embanked court. And in our cert reply brief, lest there be any doubt when the government suggested that we would be restricted to arguing the new rule question in this case, we put a footnote in our cert reply brief which expressly told the Court, no, we view this question presented as including this additional argument whether Teague applies or not. So I think we gave fair notice to the Court. And if you have any doubt But you've never presented this argument to any court before, is that right? We made the argument in an embanked petition to the Seventh Circuit, which we couldn't make it to a panel because Seventh Circuit law had already held that Teague applied in this context. Is it relevant that this is a quorum nobis proceeding rather than a habeas proceeding? No. I think we agree with the government that it doesn't matter. The way we see this is it's a first Federal filing. It's a first post-conviction filing, and it's a timely filing. The government is not challenging the timeliness of this filing. So the question that you have to ask yourself is under a system where this Court has said that IAC claims should not be brought on direct review, but rather should be brought on collateral review, whether you can apply Teague at the very first instance that somebody has to make a constitutional claim. And we think not. On theory. Alito, before you answer that question, before you go, not in relation to the Massaro argument, but in relation to the Teague argument, do you think the rule in quorum nobis is the same, that the Teague rule applies fully in quorum nobis in the same way that it applies in habeas? Well, that's the way the whole case has been litigated, and I think that's a fair assumption. The reason that we're on quorum nobis is that it's not in custody. Have we ever held that? No, you haven't. And so if you want to be extra careful, you can say the parties haven't challenged that. Remember, the reason that we're on quorum nobis is Ms. Chaydez was not in custody. And so if somebody so it's in a sense interchangeable. Alito, I understand that. Well, the consequences of a retroactive application in quorum nobis are more severe than they are in habeas, aren't they, because of the lack of a statute of limitations? More severe in the sense, I'm not sure I understand the sense. Well, under the current Federal habeas statute, you have a rather short statute of limitations to file the habeas petition. Under quorum nobis, if you prevail, then people who were convicted of offenses decades ago can raise the Padilla Art claim, can't they not? No, I'm not sure they could, Justice Alito. Well, why not? At Pet. 38, you see the district court dealing with the timeliness of this petition. And the district court finds that Ms. Chaydez could proceed because she used all reasonable diligence in bringing this claim. And the government can make lashes arguments, can make other arguments to defeat that. The government has renounced those — I mean, they let those arguments go in the Seventh Circuit and don't raise them again here. But I think that at a minimum it would be fair to say that somebody needs to bring a petition. As soon as the government advises them, they're going to seek deportation. I'm not even sure, Justice Alito. If there is an attempt to — a notice of removal for someone based on a conviction that occurred a long time ago, then that would be. You could have a timelike, but there's two things to remember. First is, you might have a timely 2255 in that circumstance, too, because, remember, in Holland v. Florida, this Court held that equitable tolling is available for people with I-8, with ineffective assistance that leads to them not being able to make the claim earlier. And the second thing is, as I was discussing with Justice Kennedy, the backward-looking aspect of Strickland would require the party, once you get more than a little while back, the prevailing norms may not be there for that kind of a claim. And so that's — Ginsburg-Mills, Mr. Fisher, are you — you're not making any argument that Teague is inapplicable because this — the underlying conviction here is a Federal conviction, not a State conviction, and Teague emphasized comity to the States. You're not making that argument? Fisher, No, I think you could hold that, and that is within our argument. I don't think you need to go that far, Justice Ginsburg. As you said, this Court has said time and again that Teague relies on comity. That's not present in this case. But we think a narrower way to decide this case, and I think the appropriate way to decide this case is to say at least for ineffective assistance claims, when you're bringing a Federal prisoner or someone who's been convicted of a Federal crime is bringing their first petition that Teague can't apply. And what I was just trying to say is, Strickland itself— Kennedy, except that — and I'm interrupting in a sense, but it's on the same track — except that it seems to me that Teague does serve the interest of repose, quite apart from interference with Federal proceeding. And that interest is surely sacrificed by the holding you wish us to make here. Well, Justice Kennedy, I'm glad you asked, because that was what I was going to say. In Strickland, this Court dealt with finality very explicitly and said, we're creating this standard which is different than other constitutional standards because we're in Strictlyn 96, 97, and 98, so therefore no different rules ought to apply in collateral proceedings as in direct review, because this Court assumed in Strickland itself and it assumed expressly again in Padilla that all of these claims would be on collateral review. So in all these cases, the Court has said finality, the concern, the very concern you mentioned, Justice Kennedy, is already baked into the Strickland formula. Mr. Fisher, I'm concerned that creating exceptions to exceptions in Teague is just a throwback to link letter standard, where we're making choices among situations and saying these will be retroactive, these won't. Answer that concern on my part, and then answer the next step is the Martinez type case, which is what happens with State reviews that are the channel IAC claims to their habeas processes. So what trumps what in that situation? Fisher, let me answer both those things. First, we're not asking this Court to create an exception to Teague. We're simply asking this Court to say Teague doesn't apply when a claim is, quote, on the equivalent of direct review, which is what this Court said in Martinez v. Ryan. And this Court's already held with respect to IAC that habeas rules, like the procedural default rule and like the Stone v. Powell bar against Fourth Amendment claims, don't apply in IAC context. So this follows exactly from those previous holdings. Now, let me say two other things, and then I can hopefully reserve my time. To answer your question about Martinez in State cases, it would depend on what the State system looked like. And I think States have their own decision to make as to whether they want a system like Arizona's, where these have to be brought in collateral proceedings, or whether, as I understand at least a couple of States do, say we're going to stay and delay the entire direct review process for years, often, to allow the IAC claim to be brought in. Now, that's exactly what this Court rejected in Massaro. And the government asked this Court to reject that in Massaro, said we don't want that kind of a system. I don't know why the government's asking for it for the first time today. And finally, remember, the last thing I'd like to say is all these problems raised not only finality concerns about the stay and remand procedure the government suggests. They also raise insoluble conflict of interest problems for Federal defender offices, who would have to bring IAC claims against themselves on direct review in order to preserve their ability to get full relief for their client. Kennedy, perhaps on rebuttal, I recognize the white light's on, you could address what is the standard you want me to apply to determine retroactivity? The brief says, oh, well, it's just new facts applying to the same general rule. Well, danger invites rescue, the assault on privity is proceeding at pace, McPherson v. Buick and the Erie Railroad case. It seems to me that those were probably new rules, but they're — it's because the facts told us what should be negligent. If at some point you could address that, I don't know what you think. Justice Kennedy, what I'd like to do, and I'm happy to elaborate, is the formulation that I think you yourself put it in Wright v. West, which is that a rule that is — that is applied to a new set of facts does not create a new rule. But if you advance the law in some way, you do create a new rule. The last thing I'd like to say about consequences is, remember, the government doesn't even have any answer for what is going to be half or more of the situations where people have pediatric claims, which is when they have a guilty plea and waive their right to direct appeal. So there, the collateral filing like this is absolutely the equivalent of direct review. And so I think this Court ought to be very wary of going down that road, if I could reserve the time I have left. Roberts  Mr. Dreeben. Dreeben, Mr. Chief Justice, and may it please the Court. In Padilla v. Kentucky, this Court announced a new rule within the meaning of Teague v. Lane, because it did— Sotomayor Do you think that's true with respect to both components of the advice, the omission and commission? I mean, it does appear that every court who dealt with the commission-type claim, the fraud, the misrepresentation of consequences said, it's clear you can't lie to your client. Now, is Teague now going to — is our ruling here going to depend on the type of claim that's raised with respect to IAC? Justice Sotomayor, this Court in Padilla didn't distinguish between misadvice and omissions to give advice, and it therefore adopted— Sotomayor At least one of our concurrences did, or two. So assuming— Dreeben That's true, but— Sotomayor —assuming, is your position that is on the retroactivity, that it applies to both kinds, omissions and commissions, that neither is retroactive? Dreeben As for Padilla's rationale, the answer is yes. But there is a rationale that governed, in our view, misadvice claims that existed before Padilla. It wasn't addressed or embraced in Padilla. It was addressed in Justice Alito's concurring opinion. Justice Alito gave two reasons which essentially mirrored the reasons that had been given in the lower courts for treating misadvice differently. And that is, affirmative misadvice violated a more basic duty of counsel that was well established, which is not to represent that you are competent on a matter that you are not competent. And the second distinction between misadvice and failure to give any advice is that a client has a constitutional right to make his or her own decision about whether to plead guilty. And a lawyer has a constitutional duty not to get in the way of that by affirmatively skewing the client's ability to make that choice. And so I would probably not disagree that a misadvice claim was not new before Padilla, and it's not really addressed by Padilla's rationale. It has its own independent sources. And the courts that had adopted that right. Sotomayor, I'm not sure, are those sources, when you say sources, it's professional norm sources. It's a different professional norm and it's a different aspect of the Sixth Amendment right. And all of the courts that had adopted misadvice, there were three of them that had done it in the removal context. There were three more that had done it in the parole eligibility context. They all simultaneously adhered to the view that as a general matter, there is no obligation to give advice about collateral consequences. And they did this, I might add, despite the fact that, as Justice Kennedy alluded, the ABA, which was cited as one of the key sources of prevailing professional norms, stated in Standard 14.3.2, in the Criminal Justice Pleasancy Act, that the defense counsel should determine and advise the defendant sufficiently in advance of any plea as to the possible collateral consequences that might ensue from entry of the contemplated plea. So there was an aspirational professional norm that collateral consequences would be on the table. But all Federal courts that had looked at this question before Padilla had concluded that collateral consequences are outside of the duty of criminal defense counsel. Sotomayor, could you tell me where my colleagues were asking about hypothetical future cases. I'm asking, do you think that every evolving professional norm, no matter how well established it becomes, would never be subject to the Teague rule because would always be a retroactive application or a new rule? No, Justice Sotomayor. Are we frozen in time to whatever the professional standards are that exist today that the Court has recognized so far? No, Justice Sotomayor. And I think this is the key point about Strickland. Justice Kennedy made this point in a concurrence in Wright v. West, and it was later cited by the Court as reflecting an accurate understanding of Strickland. It is a basic norm of professional competence, and it does not turn on professional – prevailing professional norms in publications such as the ABA. They are informative, and those norms can evolve. The Court can then announce Sixth Amendment applications of them that will be not new rules. This Court has decided close to 30 Strickland cases, according to our count, since the 1984 decision in Strickland. Scalia, what's the sense of that? Why? Let's assume, you know, at the time the guilty plea or whatever occurred, it was not the professional norm. And then later, the professional norms change, and he makes the argument that he's entitled to relief, and you say yes, because? No. I say no, Justice Scalia, because the professional norms are judged as of the time of the attorney's action. So although the professional norms can evolve, Strickland always looks to an actor at the time of the decision. Is that what your opponent contends as well? I think you probably should ask my opponent what he contends. But Strickland is fairly clear that professional norms at the time of the attorney's action are what governs. So given the ABA and everything else, why doesn't that apply here? Well, the ABA doesn't state this Court's interpretation of the Sixth Amendment. This Court made that very clear in Roe v. No, but, I mean, if the general rule is that the Strickland evolves to pick up changing professional norms, and that's what you've looked at, 30 cases, and that's what you get out of them, and then it turns out that at the time this case began, there was such a professional norm, and all that happened in Padilla is that the Court, following its general practice, said, apply that professional norm, and why doesn't the other side win? Well, first of all, Justice Breyer, that's not what the Court did in Padilla. What the Court did in Padilla, as Justice Kagan explained, in section 2 of its opinion, was first to address the question whether a criminal defense lawyer had any obligation to give advice about a consequence that would not be administered in the criminal case itself. No decision of this Court had ever held that the obligations of a criminal defense lawyer under the Sixth Amendment extended to that. Breyer, of course, is true, but the professional norm had evolved by the time of the proceeding here that they would. That was not the basis of the Court's decision. No, but in the other, in the other, by the way, in the other 29 cases, did the Court specifically say in each of those 29 cases that the basis of our decision is that the professional norm has evolved and we apply the new professional norm as of the time? Most of the cases involved well-settled duties like the duty to investigate applied to particular sets of facts. That doesn't generate a new rule. What was unique in Padilla is that the Court had to address something that it had never done before, whether the criminal defense lawyer had to give advice about a consequence that the sentencing court had no control over. And in resolving that question, this Court did not cite professional norms. It did not cite the ABA. It did not cite any of the defense manuals that recommend that lawyers advise aliens about the possibility of deportation. It instead traced the statutory evolution of the relationship between deportation and criminal justice. It examined its own cases that had discussed what a competent defense lawyer ought to think about, and it discussed statutory evolution. And it drew from that the principle that deportation is uniquely tied to the criminal prosecution in a way that no other collateral consequence possibly is. And therefore, the Court did not decide any other collateral consequence. Kennedy, as I recall, correct me if I'm wrong, one of the principal sources the Court cited in Padilla was common sense? Yes. Common sense change? Common sense may evolve. Tom Paine wrote about it, so, you know, it's originalist. Justice Kennedy, I think the Court relied on the idea that any lawyer worth his salt would inform a defendant about a particularly important consequence, a momentous consequence of pleading guilty. You probably would say the same thing to somebody who you knew was an avowed hunter and would lose the right to have firearms, or a politician that would lose the right to hold office, or a doctor who would lose a medical license, all of which can be automatic consequences of a conviction, actually more automatic than deportation, because deportation is administered by a separate body, oftentimes by a separate sovereign that has discretion whether to even institute deportation proceedings. And so the fact that we might all share an intuition that good lawyers should advise their clients about the panoply of consequences that they will experience by pleading guilty, the reality is that until Padilla, the Court had never veered from the track of saying the lawyer's duty is to help the client figure out what his odds are of prevailing at trial, what the sentencing consequences are, whether there are any affirmative defenses, and what the rights are that the client would give up by pleading guilty. Ginsburg. Mr. Dreeben, Padilla itself was a collateral proceeding. And if the State had argued in Padilla itself that a new rule was being sought and that that was permissible only on direct review, should the State have prevailed? Dreeben. No, Justice Ginsburg, because this Court held in Danforth v. Minnesota that Teague is an interpretation of the Federal habeas statute. It's an implied delegation to the Court to frame appropriate rules for Federal collateral review. But this Court is a Federal court. So if the concern of Teague is comedy, concern about the States running their own system, I understand the difference, the State collateral review and Federal collateral review, but if the idea of Teague is we don't want the Federal court to come in there and overlook what the State court did, why wouldn't that apply to this court reviewing a State court decision as much as it would apply to a Federal district court hearing a habeas from a State conviction? Well, Danforth made clear that States have discretion whether to adopt Teague-like rules. They do not have to. They can allow their citizens to have the benefit of new rules in State convictions. And this Court is doing nothing other than honoring the State's own policy choices. Do we know that that's true in Kentucky? I think Kentucky does have a Teague-type rule, but the Kentucky Supreme Court decided the issue on the merits. The State never raised Teague here. Teague is waivable. So even if you do not agree with me, Justice Ginsburg, that Danforth means that Teague had no relevance whatsoever, Teague was waived by the State, the State never addressed it. Ginsburg. And this Court could not have raised it on its own? Could have, but didn't. There is nothing in the majority opinion that says that Teague is an issue. Now, again, when I say could have but didn't, that reflects the reality that this Court can do certain things sua sponte. I do not think that in a case coming from a State system, Teague has anything to do with it, whether this Court is reviewing the case on direct review from a State system or reviewing a State collateral proceeding, Teague is not an issue. It's solely an issue when you have a 2254 proceeding or a 2255 proceeding. Kennedy. What is the standard that you wish us to apply? A new rule is announced when, and you fill in the blank, and after you fill in the blank, you fill in the direct consequences of the conviction that are under the control of the Court and collateral consequences? Two different questions. Justice Kennedy, my test is not a new rule. My test for Teague new rules is this Court's test, whether the decision was dictated by precedent so that any reasonable jurist would have reached that result, or to put it another way, that no reasonable jurist could not have. It's a little bit like the AEDPA standard. It's similar. I think the Court has said that things that don't count as new rules under Teague can also be cognizable under AEDPA. AEDPA has a contrary to provision as well as an unreasonable application provision, as Mr. Fisher pointed out. But as far as the contrary to provision works, it's parallel to Teague. So we're not asking the Court to make any new rules up about Teague. We're asking the Court to apply Teague. And in the application of Teague, the government is relying on this Court's form of analysis, which is you look at the state of the law at the time of the decision in question, when the decision became final, and you ask whether precedent compelled the result that a later decision reached. Have we applied Teague to Federal convictions before? This Court has not, except in the sense that in Boosley v. United States, the Court ran through a Teague analysis before holding that a substantive interpretation of a Federal statute is not captured by Teague. So in that sense, the Court has presumed the applicability, but it hasn't clearly held it. Ginsburg. And at least one important basis for the Teague rule is the comity to the State court system, which you don't have when the underlying conviction is a Federal conviction. True, Justice Ginsburg, but this Court has also recognized that Federal courts have an interest in the finality of Federal convictions that's every bit as strong as State courts. And so, for example, in United States v. Frady, the Court applied the procedural default rule exactly the same as it applies in State cases to Federal 2255 proceedings. But the second part of my question that you were about to answer was whether or not it's dictated by precedent. And in this case, it was not dictated by precedent because it applied to collateral consequences? What's the because? Well, there are two becauses. One is no court had held, as this Court did in Padilla, that deportation, though not administered by the sentencing court, was so intimately tied to the criminal case that the direct collateral distinction was not useful in this context. There was no precedent that dictated that. And then more generally, as you're suggesting, Justice Kennedy, the lower courts had all adopted the direct collateral reviews, ten courts of appeals and published decisions, the Sixth Circuit in an unpublished decision, 28 States, and the District of Columbia had all adhered to that line. Sotomayor So unanimous error makes right. I'm not being – I'm not trying to be sarcastic. I'm trying to see in almost every case we get here, there are split opinions below. Sometimes the split is significant or closer than other times. The – where do we draw that line? Where in the next case is any time there's a split below or there's a unanimity of opinion below, it won't fall under – it will automatically create a new rule? Dreeben I would not suggest that the Court adopt a mechanical approach. Here, all of the factors that the Court has looked at all align in the same direction. The lower courts, Federal courts, had all agreed that deportation was not the subject. Of a duty of advice, the majority of the States had held the same. This Court's decision in Padilla was significantly splintered, with four justices challenging the majority's rule as a dramatic expansion, an upheaval in Sixth Amendment law. And then when you actually look at the Court's Sixth Amendment jurisprudence, Padilla did not claim that any decision was controlling of its holding. The closest case was the Hill case, Hill v. Lockhart. And in that case, the Court approached a collateral consequence, namely, parole eligibility dates, and it said, we don't have to decide that issue on whether parole eligibility dates can be the subject of a Strickland claim because Hill had failed to show prejudice, and therefore, it was recognized as an open issue whether a consequence that's not administered by the sentencing court could be within Strickland. And so when you have the coalescence of all of those factors, I don't think that's a case where the Court has to draw a fine line between when a sufficient split below is enough to get an agreement. Breyer, I just don't want you to leave without answering the following. Normally, a new rule that this Court announces would apply to cases on direct review. Correct. All right. In the case of inadequate assistance of counsel, without being picky, the place where that claim is best developed, in my view, is first collateral, because for reasons we both understand. All right. So given the fact that, by and large, it is, and I think should be, developed in that way, why not treat, in the case of an inadequate assistance claim, the first collateral, as in other claims you treat direct review? Justice Breyer, let me give you a merits answer to that question and then an answer on why I do not think the Petitioner has fairly preserved or presented that issue to this Court. The merits answer is that Teague reflects a fundamental judgment that when a case is final on its direct review, society has a strong interest in protecting that judgment. And the exception to that is when the State or the Federal Government has not conformed to existing constitutional law. Now, bringing that down to earth for ineffective assistance claims, at the time that Ms. Scheides' conviction became final, all convictions that became final before Padilla, jurisdictions had no reason to think that they needed to protect against the possibility that a criminal defense lawyer would not have advised about deportation, because the unanimous view was that's not something that's the Sixth Amendment duty. Immediately after Padilla came down, reflecting that it was, the Criminal Rules Committee began considering an amendment to Rule 11, which is now pending before the judicial conference, that would require judges to advise defendants about the possibility of deportation consequences. In other words, it was approved by the judicial conference in September. I will accept that, if that's correct, Justice Ginsburg. The point is that as soon as Padilla made it clear that a constitutional rule about defense counsel could threaten the finality of guilty pleas, the Rules Committee has taken steps to protect the integrity of Federal judgments through a Rule 11 amendment. It had no opportunity or reason to do that. I can't say no opportunity, but it had no reason to do that as a constitutional matter until the Court decided Padilla. And so there is a logical relationship between. Breyer, you could say that same thing precisely about the cases on direct review, which had not been completed. I mean, you could say, you could give all those arguments, exactly the same. If you're worried about the time, you could have time limits on the first Federal or the first Federal habeas or State habeas. There are time limits there. You could add to those. And the direct review is itself a balance. It's a balance between the surprise and need to complicate the case and it hasn't really finished and da, da, da, versus the problem of giving a person a chance to raise this argument, even for a new rule. So all those are the – when you look at the functional factors, it looks quite similar to me, and I'm trying to. Dreeben, I don't think that it's quite identical, Justice Breyer, but there are additional considerations that are at stake here, too. First of all, Massaro, which Mr. Fisher relies on, doesn't preclude a defendant from raising a claim on direct review. It says that it's not a procedural default if he does not do that. A criminal defendant will probably not be in great shape to raise a new rule claim on direct review, but he also will not be in great shape to raise it on collateral review. Unless this Court alters its Sixth Amendment holdings, such a defendant will be pro se. They will not have a lawyer. They will be pretty much in the same fix that they are in on direct review. Now, if this Court announces that new rules under Strickland are not going to be applied to defendants whose convictions became final, then those defendants who want to raise a new rule claim are on notice that they'll need to do it on direct review. Courts of appeals will be on notice that if someone raises such a claim, the appropriate thing to do is to adjudicate it or remand for its adjudication. Now, right now, the D.C. Circuit doesn't follow Massaro. It does remand ineffective assistance claims. Mr. Fisher said he was unable to locate any cases where this actually happened. You don't have to look any further than down the road to the arguments next week in Smith v. United States, which involves a different issue, but the D.C. Circuit remanded an ineffectiveness claim in that case to the district court in direct review. It has a practice of doing that. This is actually a much easier process to administer than a general exception to Massaro, because it's a much easier process to administer. Sotomayor, you seem to be arguing against something that you didn't want previously, that there should be a stay and determine these IAC claims on direct appeal. It seems to be your argument that that's the preferred process now. Dreeben, it's not a preferred process for ineffectiveness claims generally. I think Massaro makes that clear. But you have to understand how rare a new rule under Strickland really is, the way that the Court has administered Strickland to date. Applications of the existing Strickland standard to particular sets of facts are not new rules. That's why in the 28 years since Strickland, none of this Court's decisions, and there are about 30 of them, under Strickland added up to a new rule. Padilla broke ground because it answered the question not how does Strickland apply, but whether it applies at all to something outside the compass of the sentencing court. And so in that respect, there's no reason why the standard practice under Massaro should change if this Court were to address the issue and make clear that new rules are not going to be applied on collateral review. Mr. Dreeben, if Justice Breyer were right, that there should be sort of one run up the flagpole, and the Teague doesn't kick in until that one run up the flagpole, and here, because of Massaro, the one run should include collateral review of IAC claims, if that's right, what are the costs of that? Is that an extra year, the statute of limitations, for bringing a collateral claim, or is it something more than that? It could be something more than that, because if the Court announces a new rule and makes it retroactive to a case on collateral review, F3 of the statute of limitations provision gives the defendant another one year. And I think this case actually illustrates the mischief of that. This case doesn't arise on collateral review. It arises on coram nobis, 5 years after the conviction became final. Now, if Petitioner were really serious that this Court should carve out from Teague ineffectiveness claims and adopt a rule just like the one that it did in Martinez v. Ryan, which is what he says on page 31 of his brief, then the Court should not give him the benefit of that rule, because Ms. Chavez was on probation for 4 years after her conviction. She could have raised this claim after her conviction ensued. She did not do that. She had her opportunity. She didn't take advantage of it. And I think this helps underscore why, if I can turn to this issue not being properly presented in the Court, Petitioner did not raise the ineffective assistance of counsel-type carve-out from Teague that Mr. Fisher raises in this case. That debuted for the first time in his merits brief after certiorari was granted. The government acquiesced to get resolution of the new rule question that had divided the circuits, and that will exist however this Court resolves this case. If it chooses to resolve it on the Massaro grounds, the new rule issue will still be salient for the States. It's still a circuit conflict that the Court needs to address. It was not raised below. It wasn't raised in the certiorari petition. The en banc petition raised a very general argument that Teague should not apply to Federal convictions along the lines of what Justice Ginsburg asked me about, whether comedy concerns and their absence meant there should be a difference. So you've got an argument that, so far as I can tell, has never been made to any Federal court before it's been made to this Court. And it would be remarkable for the Court to adopt that and then have to figure out how does it apply. Does Teague ever kick in? Is it a permanent exemption for ineffective assistance claims? Lots of questions that no lower court has looked at and that I would suggest this Court should not be the first to answer. It also raises an entirely new set of questions about whether Brady, which also are kinds of claims that are typically raised on collateral review, should now be exempt from Teague jurisprudence. I think the Court would really be engaging in kind of a sort of examination of Teague that had never happened before. It's sort of like experimental surgery on Teague. It shouldn't really happen in this Court in the first instance. Ginsburg. Although you recognize that we have not had a Teague case involving a Federal conviction, there is lots of language in Teague cases about the Federal court's not interfering with State courts. Teague was intended to minimize Federal intrusion into State criminal proceedings, to limit the authority of the Federal courts to overturn State convictions. I mean, we have really pressed that basis. True, but Petitioner is not pressing that basis on this Court. He's all but disavowed it. He's not seriously argued it in response to our brief that opposed his brand-new ineffectiveness carve-out from Teague. What he has done instead is concentrated much more on an analogy to Massaro. If I could give one more reason why I think the Court should refrain from entertaining that Massaro-based analogy here, the Court has just begun to embark in the Martinez v. Ryan line of cases on trying to figure out how ineffectiveness claims should be handled on collateral review. It granted certiorari on Monday in Trevino v. Thaler, where it's going to explore how does Martinez apply in a jurisdiction that may be more like the Federal system in that ineffective assistance of counsel claims aren't channeled only to direct review. They can be asserted on direct — I'm sorry, only to collateral review. They can be asserted on direct review. They are channeled largely to collateral review, but not as a matter of law. So the Court has a lot of work to do in figuring out what that decision means. And I think rather than embark on a brand-new process of applying that kind of reasoning in a case where it was never raised below, where the government never really had the opportunity to counter any of those arguments and the lower court never had the opportunity to consider them, it's not a wise use of the Court's resources. Instead, resolving the new rule question that has divided the circuits would provide an answer for us and the 28 States that filed an amicus brief that supported the United States on the new rule question and would result, I think, appropriately in concluding that Padilla was a new rule, unique among this Court's Strickland jurisprudence up to that time, and is not available in two cases on collateral review. Thank you, counsel. Mr. Fisher, you have two minutes remaining. Fisher, I'd like to make two points. First is, picking up where Mr. Dreeben left off, we're not asking for anything that's difficult. Mr. Dreeben referred to the Frady case, where this Court held that there's enough of an interest in finality to have procedural default apply to Federal post-conviction review. Yet in Massaro, this Court carved out IAC claims. Exactly the same analysis applies here. And I do think the Court really ought to answer that question in this case, because if you hold that Padilla is a new rule and that Teague now applies to IAC claims, rest assured the Federal courthouses are going to be flooded, flooded with Federal defenders and other criminal lawyers raising IAC claims on direct review. There would be nothing else a responsible lawyer could do, because if you say Teague applies if you wait until collateral review, but it doesn't apply on direct review, any responsible lawyer seeking to protect his client has to bring it on direct review. It's going to absolutely change the way criminal procedure and criminal appellate procedure happens in the Federal court system. The second point I wanted to make is back to the new rule question. I think I heard Mr. Dreeben say that the lower courts that had said that misadvice about deportation consequences violated Strickland had said something that was within Strickland that didn't constitute a new rule. So it can't be that Strickland broke new ground, if he's correct, by saying deportation advice falls within the ambit of the Sixth Amendment in a guilty plea context. The only thing he relies on in the end is this distinction the lower courts had drawn between acts and omissions. And that's exactly the distinction in Strickland that this Court rejected, and in Padilla itself, this Court used the word absurd. And I think, Justice Kennedy, when you mention common sense, I think we could throw that in, too. And so to the extent that the argument, at the end of the day when everything stripped away, is that the lower courts were reasonable in saying that failing to advise about the most important thing a client would have been thinking as to whether to plead guilty is not an effective assistance of counsel, whereas giving bad advice is. That's a line that Strickland itself rejected, that Flores-Ortega rejected when it came to the right to appeal and whether the lawyer ought to give advice, and it's a line that this Court in Padilla had no difficulty whatsoever rejecting, called it absurd. Sotomayor, can I go back to one of your points? Your red light is on, but it is important, the floodgate issue. Fisher, I'm not sure about the floodgates for the following reason. Once we announce Padilla, any pending direct claim and any pending collateral claim that arises after Padilla for something that happened after Padilla would be covered by the rule, so there would be no bar to those claims. So the floodgate is temporary if there is one. Fisher, No, it's not, Justice Sotomayor. The issue arises because Teague ordinarily comes into play when somebody asks the court to create a new rule and apply it to him. So all the hypotheticals we've talked about today, about would Strickland apply here, would Strickland apply there, to parole advice, to professional license, all of those claims would be asking, if the government is correct, for a new rule. Roberts, Thank you, counsel. Fisher, So all of those claims would have to be brought. Thank you. Roberts, The case is submitted.